**SO ORDERED.**

**SIGNED this 22 day of May,2015.**

_____
Stephani W. Humrickhouse
United States Bankruptcy Judge

_____

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
RALEIGH DIVISION

| | |
|---|---|
| IN RE: | CASE NO. |
| WILLIAM DOUGLAS PARKER, JR.<br>DIANA LYNNE PARKER | 12-03128-8-SWH |
| DEBTOR | |
| CONAN R. MCCLAIN | |
| Plaintiff | ADVERSARY PROCEEDING NO. |
| v. | 12-00238-8-SWH-AP |
| WILLIAM DOUGLAS PARKER, JR.<br>DIANA LYNN PARKER | |
| Defendants. | |

**ORDER REGARDING CROSS MOTIONS FOR SUMMARY JUDGMENT**

This matter came on to be heard upon the cross motions for summary judgment filed by Conan McClain ("McClain") and William Parker and Diana Lynne Parker (collectively, the "Parkers"). A hearing was held on February 4, 2015 in Raleigh, North Carolina.

**BACKGROUND**

The Parkers[1] own various tracts of real property in North Carolina, and prior to filing for bankruptcy, had engaged in the business of developing real estate in and around Raleigh. The Parkers operated their business through two companies in which they are the primary shareholders and officers, Gregory & Parker, Inc., and Gregory & Parker - Seaboard, LLC. The Parkers maintain that they relied on the advice of professionals, including, among others, McClain, in conducting their business. In addition to their real property ownership, the Parkers have a large collection of personal property, most notable being numerous historical artifacts recreationally collected by Mr. Parker over the past five decades and housed in a museum located at their primary residence. The historical artifacts consist primarily of World War II relics, but the Parkers also own certain Civil War-era items, a collection of vehicles and various other antiques inherited from Mr. Parker's parents.

The Parkers filed a petition under chapter 11 of the Bankruptcy Code on April 25, 2012. They filed their original Schedule B on May 3, 2012. The original Schedule B omitted certain items, namely, animal wall mounts displayed in the Parkers' home, three Chevrolet classic vehicles (specifically, two 1955 Chevrolet 4S's and one 1929 Chevrolet 2S) and a John Deere tractor. On June 22, 2012, the Parkers' 341 meeting was held. The omitted items were not specifically discussed, but McClain posed one question, "[a]nd the automobiles, that's all the automobiles titled or untitled that you got[?]" to which Mr. Parker responded that "[s]ome of them run, some of them don't." On July 23, 2012, McClain filed a motion to extend the time to object to the Parkers' discharge, which was granted by Order dated August 29, 2012. On July 31, 2012, McClain filed a

---

[1] Unfortunately, sometime after the hearing, the court was informed that Mr. Parker passed away. Pursuant to Bankruptcy Rule 1016, the court deems it to be possible and in the best interest of the parties for Mr. Parker's case to proceed. Fed. R. Bankr. P. 1016.

motion for 2004 examination, and therein requested documents and correspondence related to the Chevrolets and the game trophies. Thereafter, on August 23, 2012, the Parkers filed an amendment to Schedule B which listed the omitted items. On September 12, 2012, McClain took the 2004 examination of the Parkers.

On September 17, 2012, McClain initiated this adversary proceeding objecting to the Parkers' discharge under 11 U.S.C. §§ 727(a)(4)(A) and (a)(2). McClain asserts that the Parkers' discharge should be denied under § 727(a)(4)(A) because they "knowingly omitted and/or intentionally misrepresented the true nature, extent, and/or value of personal property." Compl., Doc. No. 1 at 4. McClain contends that the Parkers knowingly and fraudulently made false oaths in their bankruptcy schedules by: failing to itemize their extensive World War II collection and labeling it in a vague and misleading manner; misrepresenting the value of the World War II collection by listing the value as "unknown;" undervaluing certain personal property; and failing to disclose certain property of personal significance in their original bankruptcy schedules. McClain also alleges that the Parkers' discharge should be denied under § 727(a)(2) because Mr. Parker "knowingly and fraudulently transferred, removed, and concealed personal property, including valuable coins and firearms" from his business office to his personal residence in order to conceal such property from the Bankruptcy Administrator. Compl. at 5.

In their answer, the Parkers assert that they did their best to list all of their assets and assign fair values, and that with respect to the World War II and other collectibles, there was no way to accurately assign a value. Further, the Parkers raise as a defense that McClain and his associates provided substantial assistance to them in preparing their business and personal bankruptcy schedules. The Parkers assert that they provided information to McClain and his associates that

included the omitted items, and they were not sure why such information was omitted from the information provided by McClain and his associates to the Parkers' counsel to be included in their schedules. The Parkers state that they amended their schedules as soon as they realized the omission. On July 8, 2013, the Parkers moved for summary judgment as to all of McClain's claims against them, and McClain moved for partial summary judgment as to his claim under § 727(a)(4)(A).

## DISCUSSION

"[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986) (quoting Fed. R. Civ. P. 56(c)). In making this determination, the court views all facts and inferences to be drawn from the facts in the light most favorable to the nonmoving party. U.S. v. Diebold, Inc., 369 U.S. 654, 655, 82 S. Ct. 993, 994 (1962) (per curiam). Summary judgment is not a "disfavored procedural shortcut," but an important mechanism for filtering out baseless claims and defenses. Celotex, 477 U.S. at 327, 106 S. Ct. at 2555. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex, 477 U.S. at 323, 106 S. Ct. at 2552. Although there are credibility determinations inherent in a typical objection to discharge proceeding that often create genuine factual issues, the court notes that the unusual circumstances of this case prevent the court from making a later determination as to credibility. Rather, in light of Mr. Parker's passing, the record is set, making summary judgment an especially appropriate tool.

Section 727(a) provides that "[t]he court shall grant the debtor a discharge, unless–"

> (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed,

4

>     destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated or concealed–
>           (A) property of the debtor, within one year before the date of the filing of the petition; or
>           (B) property of the estate, after the date of the filing of the petition;
>     . . . .
>     (4) the debtor knowingly and fraudulently, in or in connection with the case–
>           (A) made a false oath or account.

Discharge provisions are construed liberally in favor of debtors and strictly against the person objecting to discharge. In re Seung Chan Park, 480 B.R. 627, 631-32 (Bankr. D. Md. 2012). The discharge statute recognizes dual policies: providing a fresh start to honest debtors while also denying such benefits to "'those who play fast and loose with their assets.'" Id. at 632 (quoting Farouki v. Emirates Bank Int'l, Ltd., 14 F.3d 244, 249 (4th Cir. 1994)). Under both §§ 727(a)(2) and (a)(4)(A), the court may infer that the debtor acted with the necessary intent from a pattern of concealment and nondisclosure. In re Ingle, 70 B.R. 979, 983 (Bankr. E.D.N.C. 1987). Intent exists if the debtor acted with a reckless disregard for the truth. Id.

      The court will first address the Parkers' argument that no genuine issue of material fact exists regarding McClain's § 727(a)(2) claim. McClain has alleged that, one day prior to the scheduled site visit by the Bankruptcy Administrator in the Parkers' corporate bankruptcy case, Mr. Parker removed property, consisting of valuable coins and firearms, from the safe at his company's office and transferred it to his personal residence.[2] At the September 12, 2012, 2004 examination of the Parkers, Mr. Parker admitted to moving the personal items to his home because he "didn't know if it was going to be stolen or not," and stated that the items moved included "Civil War items, old guns, odds and ends from there, all his hand guns." Ex. 8 to Pl. Mem. in Supp. of Summ. J., Doc.

---

[2]McClain has not alleged that Mrs. Parker was involved in the transfer, and thus it is appropriate to grant summary judgment in her favor as to the § 727(a)(2) count.

No. 39 at 65-66. McClain asserts that the timing, as well as the fact that the Parkers had experienced break-ins and thefts at their residence, supports his allegation that Mr. Parker actually caused the transfer to conceal the property from the Bankruptcy Administrator. However, Mr. Parker's affidavit, on file with the court, states that he did not move the property to conceal or hide it, but rather moved it so that it would not be confused with company property.

It is an undisputed fact that the property moved from the company safe was personal, rather than company property, and that the site visit was regarding the Parkers' corporate bankruptcy case, rather than their personal bankruptcy case. Under these circumstances, it is only logical that Mr. Parker would separate his personal property from the company property prior to the Bankruptcy Administrator's visit. Indeed, counsel for McClain agreed that separating personal and company property was an equally reasonable explanation for Mr. Parker's actions at the hearing. Further, the court does not find that Mr. Parker's prior statement that the transfer was motivated by his fear of theft indicates fraudulent intent, nor does it create a genuine factual issue regarding intent. Either, and indeed, both, of Mr. Parker's explanations are reasonable in light of the circumstances of this case. Based on the materials before the court, there is simply no evidence that would tend to support McClain's allegation that Mr. Parker acted with fraudulent intent. The court finds there to be no genuine factual issue as to whether Mr. Parker acted with the requisite culpable intent for purposes of § 727(a)(2), and summary judgment for him is proper as to this claim.

Next, the court will consider the parties' cross motions for summary judgment as to McClain's § 727(a)(4)(A) claim. To constitute a basis to deny discharge under this section, a debtor must have "knowingly and fraudulently" made a "false oath or account." § 727(a)(4)(A). This requires a debtor to have made a statement under oath which he knew to be false, and to have made

6

the statement willfully, with intent to defraud. In re French, 499 F.3d 345, 352 (4th Cir. 2007); Williamson v. Fireman's Fund Ins. Co., 828 F.2d 249, 251 (4th Cir. 1987). Discharge will not be denied when the untruth was the result of mistake or inadvertence. In re Parnes, 200 B.R. 710, 714 (Bankr. N.D. Ga. 1996). Furthermore, the false oath must have been related to a material matter. Williamson, 828 F.2d at 251. A matter is material if it "bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property." Id. at 252 (quoting In re Chalik, 748 F.2d 616, 618 (11th Cir. 1984)). Fraudulent intent may be demonstrated by a material misstatement with knowledge of falsity, an omission with knowledge that it will create a false impression, or by reckless indifference to the truth. In re Belk, 509 B.R. 513, 520 (Bankr. M.D.N.C. 2014); see also In re Ingle, 70 B.R. 979, 983 (Bankr. E.D.N.C. 1987) (reckless disregard for the truth is sufficient). While it has been held that a subsequent amendment to schedules does not expunge the initial falsity, see In re Johnson, 82 B.R. 801, 805 (Bankr. E.D.N.C. 1988), the fact of prompt correction may be evidence probative of a lack of fraudulent intent, see In re Beauchamp, 236 B.R. 727 (9th Cir. 1999). Ultimately, the determination depends on the facts and circumstances of the case. Williamson, 828 F.2d at 252.

The court will first consider the Parkers' failure to list the three classic Chevrolet vehicles, John Deere tractor and animal wall mounts from their original Schedule B. It is undisputed that this omission from the Parkers' schedules equates to a "false oath or account," but it will only serve as a basis to deny the Parkers' discharge if it was done "knowingly and fraudulently." § 727(a)(4)(A). Upon consideration of all the evidence, the court finds there to be no genuine issue of material fact

7

as to whether the Parkers' omission was knowing and fraudulent, and concludes that it was not. The court reaches this conclusion in light of several pertinent considerations.

First, the Parkers have an unusually large collection - and wide range - of personal property, consisting of historical artifacts Mr. Parker collected over five decades without ever making an inventory. The collection includes at least 13 vehicles in addition to the classic cars, a personal shop that houses "worlds of junk . . . anything, everything and whatever," and a museum of World War II relics. Ex. 8 to Pl. Mem. in Supp. of Summ. J., Doc. No. 39 at 23-24. In addition to never making an inventory, Mr. Parker stated that he never had any of the items appraised. Id. at 25-26. Among the relics in the museum are: "medals, badges, flags, American, British, German, Italian relics, just too numerous to mention honestly," as well as uniforms, guns and daggers, although Mr. Parker stated that many of the items had been stolen over the years. Id. Mr. Parker's collection also includes figurines he inherited from his mother, Indian items he purchased while traveling, and a coin and watch collection he inherited from his father. Much of this property was actually disclosed in the Parkers' original schedules. The items omitted, in light of the amount of property in existence, is not material. See Matter of Woodlands Inv. Assocs., 95 B.R. 681, 682 (Bankr. W.D. Mo. 1988) (circumstances supported no fraudulent intent despite the fact that the schedules omitted a great amount of property where property omitted was of the type that does not easily come to mind when surveying readily disposable property, and where debtor had an unusually wide range of property, much of which was disclosed in schedules).

McClain appears to regard the omission of the classic cars as the most egregious. However, the court deems the omission excusable in light of Mr. Parker's testimony that the vehicles did not run, and had in fact never been driven by Mr. Parker. Further, the vehicles had been housed outdoors

in Wake County[3] for years. Doc. No. 39 at 53-54. Mr. Parker also stated that one of the 1955 models "looks like hell," and that while the interiors of the vehicles had been restored, the exteriors had not. Id. at 53-54. Although Mr. Parker readily admitted to his affinity for classic cars, and especially 1955 Chevrolets, he stated that he had not been to a car show in "quite a while," and that he was no longer collecting. Id. at 55.

      Second, the Parkers have continuously maintained that they received substantial assistance from McClain and his associates in preparing their bankruptcy schedules, and that prior to filing their petition, they provided information to McClain regarding the particular items omitted. The record is deficient as to a contrary assertion by McClain. If the Parkers' contention is a fact, it makes it difficult for McClain to maintain his position. The court cannot fathom why the Parkers would disclose such information to McClain, a creditor, had they truly been trying to defraud their creditors. Assuming the Parkers' contention is true, McClain was apprised of the nature and a great extent of the Parkers' property. This is clearly not a case where creditors, and especially McClain, were forced to use their own resources to discover property concealed by unscrupulous debtors. On the contrary, the fact that the Parkers solicited help from McClain in preparing their schedules, in addition to aid of counsel, evidences that they acted carefully and without reckless disregard. See In re Bernard, 99 B.R. 563, 570 (Bankr. S.D.N.Y. 1989) (no fraudulent intent; debtor revealed all transactions revealed in creditor's complaint prior to filing his petition). However, regardless of whether McClain helped the Parkers prepare their bankruptcy schedules, the court reaches the same conclusion as to the Parkers' intent.

---

[3]The Parkers are residents of Johnston County.

Third, the Parkers promptly amended their schedules as soon as they realized the omission, and have always been forthcoming in their answers to interrogatories, sworn questioning and depositions. At the Parkers' 2004 examination, Mr. Parker testified openly and in detail about the John Deere tractor, his collection of vehicles, the animal wall mounts and his World War II collection. Mr. Parker stated that he had killed the animals on the wall mounts while on a hunting trip with his father years ago, and that some of the animals are endangered and illegal to sell. Doc. No. 39 at 60-61. In their interrogatories, the Parkers admitted to omitting certain items in their original schedules. The Parkers stated in their affidavits that the omissions were unintentional, and there is nothing before the court that creates a factual dispute otherwise. See In re Arnold, 369 B.R. 266, 273 (Bankr. W.D. Va. 2007) (fact that debtor was forthcoming at 341 meeting supported conclusion that fraudulent intent was lacking); compare with Williamson v. Fireman's Fund Ins. Co., 828 F.2d 249, 251 (4th Cir. 1987) (debtor made two false oaths in statement of financial affairs and made false oath at 341 meeting, which he later admitted); In re Seung Chan Park, 480 B.R. 627, 638 (Bankr. D. Md. 2012) (series of omissions and inaccuracies with no effort to correct or amend schedules); In re Sullivan, 444 B.R. 1, 4 (Bankr. D. Mass. 2011) (debtor did not voluntarily reveal he owned a Rolex watch and only showed it to the trustee after the plaintiff advised the trustee that she had given it to debtor; debtor gave misleading answer in interrogatory by stating that he brought the watch to his 341 meeting and showed it to the trustee); In re Cantu, 2009 WL 1374261, at *2 (Bankr. S.D. Tex. May 15, 2009) (debtors were uncooperative with court and trustee; failed to provide material documents to the trustee and violated court orders).

Fourth, the court is influenced by the fact that the Parkers have proposed, and are operating under, a full payout plan. The omission was clearly not an attempt to avoid paying creditors. Fifth,

10

the court notes the lack of involvement or concern by the Bankruptcy Administrator or any other creditor. Surely, if there was genuine concern that the Parkers were engaging in fraudulent conduct that posed a threat to the administration of their bankruptcy estate, other parties would get involved. See In re Segal, 195 B.R. 325, 333-34 (Bankr. E.D. Penn. 1996) ("As indicated by the absence of involvement of the Trustee or any other creditor, the Debtor's misrepresentations have no effect on the administration of the bankruptcy case in and of themselves."). Noticeably absent from the record, which, as the court already noted is set, are any facts that might indicate fraudulent intent, or even that the debtors acted with reckless disregard in filing their original Schedule B. McClain argues that the collective deficiencies show a reckless disregard, but the court simply cannot agree. The evidence tends to show nothing beyond mere excusable neglect.

      The court will next consider whether the Parkers fraudulently concealed the scope and value of their military relic collection in their schedules by labeling it in a vague and misleading manner and by listing the value as "unknown." The Parkers' Schedule B lists, under household goods, "Museum: (7) show cases, (2) tables, (8) chairs, Misc relics including WWII collectables (American, German, British, Italian, Japanese), bulk clothes and hats . . ." McClain asserts that the Parkers' listing of the collection under "household goods and furnishings," rather than under "antiques or collectibles," as was done with their coin, watch, doll and figurine collections, was fraudulent for purposes of § 727(a)(4)(A). McClain also contends that the military collection was ambiguously described, and points to the fact that more mundane items were listed in detail. McClain alleges that the short and unremarkable description was done with fraudulent intent, and cites to Mr. Parker's ability to provide a more detailed description and evaluation of the collection, including some estimates as to value of certain relics, during his 2004 examination. In particular, McClain asserts

that the Parkers' failure to confirm possession of and schedule a particularly valuable dagger, and their failure to produce a valuable gun at the time of McClain's appraisal, evidences fraudulent intent.[4] McClain also cites to personal financial statements from 2008 and 2011, wherein the Parkers valued their antiques and collectibles at $450,000.00, an inventory from Mr. Parker's father's estate, which is where Mr. Parker got the values he used in Schedule B for the particular items he inherited, and several police reports listing values, to show that the Parkers' failure to assign a clear value on their schedules was fraudulent.

Once again, the court finds no evidence to support McClain's contention that the Parkers acted with the requisite culpable intent. The court relies on the same findings set out above in reaching this conclusion. The court finds it pertinent that Mr. Parker never possessed any inventory of the collection, and further, that he had never had it appraised. Additionally, Mr. Parker stated that he was unsure of the exact extent of his collection due to numerous thefts had occurred over the years,[5] and stated that he had lost interest in the relics.

The court also finds that listing the value as "unknown" was reasonable in light of the extensive nature of the collection, the fact that the artifacts were never appraised, the fact that Mr. Parker acquired the items over several decades, amidst changing prices, and because Mr. Parker was no longer collecting and therefore was without knowledge as to current rates. As Mr. Parker testified, the value of the artifacts fluctuate not only over time, but also simply due to varying quality

---

[4]These items were not discussed at the hearing.

[5]In particular, as to guns in his possession, Mr. Parker stated that "I might have a few left here and there. Other than that, the big majority of them have been stolen. I've had so much stuff stolen, I can't accurately tell you what I've had stolen without sitting down and pondering for hours on end. After a lot of it got stolen, I just throwed [sic] my hands up in the air. I don't worry with it no more. It's a lifetime gone." Doc. No. 39 at 47.

and condition. Mr. Parker stated that he bought many of the items decades ago, when they were cheaper. Mr. Parker also stated "I'm starting to lose interest in worrying with it. There's been so much taken from me. I mean, the heck with it. A lifetime of collecting gone? That's very discouraging." Doc. No. 39 at 32.

Mr. Parker largely did not have an opinion of value as to the relics, although he testified generally that some items were valuable,[6] and estimated the value of certain other items.[7] Mr. Parker was unable to state the collective value of his entire collection. In response to a question concerning whether he had thought about the collective value of the antiques and collectibles, Mr. Parker stated, "[n]o, not really. I don't think about any of it anymore ever since so much if it's been stolen. I basically just erased it from my mind." Doc. No. 39 at 84. The court finds that Mr. Parker's ability to provide a general estimate of the value of certain collector's items, such as a flag, does not indicate that he knew or concealed the value of his relics, which varied in condition and number. The ability to estimate that a particular item might be worth a certain amount is a far cry from valuing an entire collection, especially one which includes numerous relics with entirely unknown values. The court finds the Parkers' listing of value as "unknown" to be proper under the circumstances. This conclusion is supported by the fact that McClain objected to the values of antiques that the Parkers did list, and this issue is squarely before the court should the Parkers' plan fail to pay creditors in full.

---

[6]Doc. No. 39 at 27 (medals), 25 (uniforms; "I haven't bought any uniforms in years. So you're talking about mega bucks now.").

[7]Doc. No. 39 at 29 (uniforms worth $1,200 to $1,500), 31 (flags worth $600 to $700; Adolf Hitler flag worth $1,500), 34 (particular dagger worth $17,000, but not sure if still owned it), 35 (daggers worth $600, but those in ragged shape only worth $275 to $300).

The fact that the Parkers assigned a value to the collection in previous personal financial statements and police reports is also unavailing to McClain. See In re Parnes, 200 B.R. 710 (N.D. Ga. 1996). In In re Parnes, 200 B.R. at 715, the court held that the debtor's listing of the value of his dental practices as "unknown" in Schedule B did not amount to a false oath. The plaintiffs argued that listing the value as "unknown" was a false oath because the debtor had valued the practices in his divorce proceedings and in financial statements submitted to lenders. Parnes, 200 B.R. at 715. However, the evidence showed that the debtor actually thought he should list a negative value because the practices were laden with debt, but his attorney advised him to list it as "unknown" because he did not know a *specific* value. Id. at 716-17. The Parnes court distinguished the case from others where it was found to be fraudulent to list values as unknown, citing FDIC v. Ligon (In re Ligon), 55 B.R. 250, 253 (Bankr. M.D. Tenn. 1985) and Morton v. Dreyer (In re Dreyer), 127 B.R. 587, 593 (Bankr. N.D. Tex. 1991). 200 B.R. at 718.

The Parnes court noted that in Ligon, 55 B.R. 253, the debtor's listing of stock as having an "unknown" value was fraudulent in light of his savvy in financial affairs and thirty years of experience as a banker, and because of the debtor's ongoing pattern of fraudulent misrepresentations and omissions. In Morton, 127 B.R. at 593, the debtor's listing of stock as having an "undetermined" value was fraudulent because the debtor not only knew the corporation had substantial value, but also affirmatively represented to the trustee at the first meeting of creditors that it had no value and deliberately attempted to conceal such value. This court finds, similar to the court in Parnes, that the Parkers' listing of the value of the museum as "unknown" was not fraudulent. Mr. Parker did not try to conceal the value of his collection; he simply had no ability to

pinpoint a specific value for it and believed that listing the value as unknown was the most accurate valuation he could provide. See id. at 717.

Next, the court will consider McClain's contention that the Parkers undervalued certain assets, including the classic Chevrolets and certain firearms, in a knowing and fraudulent manner. McClain filed his motion for summary judgment and accompanying memorandum on July 8, 2013. In support, McClain offered two appraisals, one of which was submitted along with his memorandum on July 8, 2013, and the second of which was filed on July 29, 2013 as a supplement to his motion for summary judgment. The court questions the admissibility of the appraisals, but regardless, finds that they are not probative of fraudulent intent. With or without the appraisal evidence, the same conclusion is apparent: the Parkers did not act with the requisite knowing and fraudulent intent in listing values on their schedules.

The previous discussion regarding the military relics shows that the Parkers assigned values to the best of their ability in a non-fraudulent and non-reckless manner. Additionally, Mr. Parker's 2004 examination testimony regarding the classic Chevrolets supports the court's conclusion in this regard. Mr. Parker stated that the vehicles were acquired roughly a decade ago,[8] and that he did not purchase the 1929 Chevrolet 2S, but rather, it was given to his father in exchange for a debt. Ex. 8 to Pl. Mem. in Supp. of Summ. J., Doc. No. 39 at 56-57. With regard to the scheduled value of a particular 1955 Chevrolet, Mr. Parker stated that "[i]t would be worth that for sure," and that "[i]t might be worth a little more maybe." Id. at 59. Mr. Parker could not remember what he paid for the 1955 Chevrolets, and retained no receipt or bill of sale. Id. at 57. Instead of showing that Mr. Parker

---

[8]Mr. Parker stated that he acquired the 1929 Chevrolet 2S roughly 12 to 15 years ago, and that he purchased a 1955 Chevrolet 4S roughly a decade ago and another 1955 Chevrolet 4S four years ago. Ex. 8 to Pl. Mem. in Supp. of Summ. J., Doc. No. 39 at 56-57.

knew the values of the Chevrolets and deliberately attempted to conceal such values, the evidence at most appears to show that Mr. Parker did not know specific values. This does not satisfy the scienter requirement of § 727(a)(4). This is especially so in light of the foregoing discussion regarding the military relics. The court finds that there is simply no evidence before it to indicate that the Parkers acted in a knowing and fraudulent manner in scheduling the values of the Chevrolets.

The court also finds that it was not fraudulent for the Parkers to use the gun values from the 1991 inventory of Mr. Parker's father's estate. The Parkers clearly did not know if and to what extent the values had changed,[9] and this was the most accurate valuation they had.[10] Furthermore, for all of the aforementioned reasons in preceding paragraphs, and especially the discussion regarding the value of the military relics, the court deems this not to have been fraudulent. In light of the foregoing, Parkers' motion for summary judgment as to McClain's § 727(a)(4)(A) claim is granted, and McClain's motion for summary judgment is denied.

## CONCLUSION

In conclusion, the court finds there to be no genuine issue of material fact regarding McClain's claims under either §§ 727(a)(2) or (a)(4). McClain's motion for summary judgment as

---

[9] Mr. Parker did not zealously collect guns; most of his collection was inherited from his father. He stated that "a big majority" of "what little [he] had" collected was stolen, and that he had not purchased a gun in nine years. See Doc. No. 39 at 44-47.

[10] Regarding getting an updated appraisal of the guns, Mr. Parker stated "I don't care what they're worth. They're personal belongings. I never plan to get rid of them. They're my father's things." Doc. No. 39 at 47. Mr. Parker also stated that his father's collection consists of Civil War-era pistols, in which he was not interested. Id. "I don't care anything about Civil War relics. So-so. I've never really taken the time to pay any attention to it." Id.

to his § 727(a)(2) claim is **DENIED**, and the Parkers' motion for summary judgment as to McClain's claims under §§ 727(a)(2) and (a)(4) is **GRANTED**.

**END OF DOCUMENT**